**HDM CORP., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

and

**Group Health Incorporated, Defendant–Intervenor.**

No. 04–694 C.

United States Court of Federal Claims.

Filed Under Seal Nov. 30, 2005.

Reissued Dec. 14, 2005 [1].

April 29, 2005 protective order. The parties were given an opportunity to advise the Court of their views with respect to any "protected information" referred to in the opinion that they asserted was required to be redacted under the terms of the protective order. Plaintiff and defendant did not request any redactions. Defendant-intervenor requested certain redactions, which the Court subsequently reviewed. The Court proposed alternative redactions and submitted these redactions to defendant-intervenor for review. Defendant-intervenor accepted the Court's alternative redactions. The Court's redactions are indicated by asterisks in brackets ( [* * *] ).

L. Steven Grasz, Timothy K. Dolan, Blackwell Sanders Peper Martin, Omaha, Nebraska, for plaintiff.

Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, Mark A. Melnick, Assistant Director, Andrew P. Averbach, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington D.C., for defendant. Jamie B. Insley, H. Antony Lim, Department of Health and Human Services, Baltimore, Maryland, of counsel.

Thomas P. Humphrey, David Florin, Elizabeth W. Newsom, Crowell and Moring, LLP, Washington, D.C., for defendant-intervenor.

## OPINION AND ORDER

GEORGE W. MILLER, Judge.

This matter is before the Court on plaintiff's Motion for Partial Summary Judgment on the Administrative Record pursuant to Rule 56.1 of the Rules of the Court of Federal Claims ("RCFC"), plaintiff's Motion for Preliminary Injunction pursuant to RCFC 65(a), defendant's Cross–Motion for Partial Judgment Upon the Administrative Record pursuant to RCFC 56.1, and defendant-intervenor's Cross–Motion for Partial Summary Judgment on Counts II and III. The Court heard oral argument on the motions on October 28, 2005. At the conclusion of the argument, the Court announced its decision and summarized its reasoning orally from the bench. The Court stated that a written opinion would follow. For the reasons discussed below, plaintiff's Motion for Partial Summary Judgment on the Administrative Record is DENIED, and defendant's Cross–Motion for Partial Judgment Upon the Administrative Record and defendant-intervenor's Cross–Motion for Partial Summary Judgment on Counts II and III (treated as a motion for judgment on the administrative record as to Counts II and III) are GRANTED. Plaintiff's Motion for Preliminary Injunction is DENIED as moot.

## BACKGROUND [2]

Medicare is a nationwide, federal insurance program for persons 65 years of age or over and certain younger disabled persons. AR Tab 14 at 772, § 1.1., The Medicare Program.[3] The Centers for Medicare and Medicaid Services ("CMS") is an agency of defendant United States within the Department of Health and Human Services ("HHS") responsible for administration of the Medicare Program, including formulation and promulgation of Medicare Program policy and guidance, contract execution, and operation and management.[4] AR Tab 14 at 774, § 1.1, The Medicare Program. In 1999, CMS entered into a Coordination of Benefits ("COB") contract with defendant-intervenor Group Health Incorporated ("GHI") to ensure that Medicare dollars were paid correctly and to simplify the coordination of payments between Medicare and private insurers. Decl. of Harry Gamble ¶ 2. In 2003, CMS issued a modification to the COB contract. Id. ¶ 19. Plaintiff HDM Corp. ("HDM"), a company that serves as a clearinghouse for Medicare claims, alleges that this modification was issued without competitive bidding in violation of the Competition in Contracting Act ("CICA"), 41 U.S.C. § 253 (2000). Pl.'s Br. in Support of Mot. for Summ. J. at 1; Pl.'s Statement of Facts ¶ 2.

## I. Overview of Medicare Claims Processing

To explain the contract modification at issue in this litigation, it is necessary to provide substantial background information regarding Medicare claims processing and the changes to this process under the COB contract. The process is highly technical and complicated, and involves many terms of art not within the knowledge of most lay persons.

Medicare does not typically pay for all of the health care costs of its beneficiaries, and therefore, many of these beneficiaries have additional health insurance. Decl. of Peter Moore ¶ 4. In addition, situations arise where a third party's insurance, rather than Medicare, bears primary responsibility for paying for a Medicare beneficiary's health care costs. Id. For example, if a beneficiary is in

---

2. This recitation of facts constitutes the Court's primary findings of fact based on the administrative record as supplemented by the parties with the Court's permission. Other findings of fact and rulings on questions of mixed fact and law are set out in the Discussion section.

3. For the sake of simplicity, the Administrative Record presented by defendant and defendant-intervenor will be denoted as "AR," while the Administrative Record presented by plaintiff will be referred to as "HDM AR."

4. CMS was formerly known as the Health Care Financing Administration ("HCFA"). Decl. of Harry Gamble ¶ 2. For purposes of consistency, the agency will be referred to as CMS throughout this opinion.

an accident caused by a third party, that third party's insurance, rather than Medicare, may be primarily responsible for the beneficiary's health care costs resulting from the accident. *Id.* Therefore, when a beneficiary incurs health care costs, it is necessary to determine which payer is primarily responsible for these costs to arrange for payment to the health care provider. *Id.* ¶ 5.

The process of determining which entity is responsible to pay benefits and arranging for the payment of benefits by the correct payer is known as coordination of benefits. *Id.* The coordination of benefits process encompasses two claims-payment situations: (1) Medicare secondary payer ("MSP"), where another insurer is the primary payer and Medicare is the secondary payer; and (2) the transfer of Medicare-paid claims to supplemental insurers ("transfer claims"), where Medicare pays first and another insurer pays second. Decl. of Harry Gamble ¶ 3. MSP claims processing encompasses a much more varied and multi-dimensional set of processes than transfer claims processing, and is not at issue in this litigation. *See id.*

Historically, the processing of both MSP and transfer claims relied upon claims-processing contractors. *Id.* ¶ 4. Sections 1816(a), 42 U.S.C. § 1395(h) (2000), and 1842(a), 42 U.S.C. § 1395(u) (2000), of the Social Security Act authorize the Secretary of HHS to enter into contracts with private entities for the purpose of distributing Medicare payments. *Id.*; AR Tab 14 at 774, § 1.1, The Medicare Program. These private claims contractors are known as Fiscal Intermediaries ("FIs") and carriers.[5] Def.'s Statement of Facts ¶ 3, Decl. of Harry Gamble ¶ 4. In total, HHS entered contracts with 51 separate FIs and carriers that distributed payments for Medicare. Decl. of Harry Gamble ¶ 4.

Prior to the COB contract, when a Medicare beneficiary received medical treatment from a health care provider, the provider would bill the FI or carrier serving the region where the services were provided. Decl. of Harry Gamble ¶ 5. The FI or carrier would send the claim information to a master file, known as the Common Working File ("CWF") for validation. *Id.* The CWF determination would be communicated back to the FI or carrier, which would either make payment or generate a notice of denial or non-coverage to the provider. *Id.* However, if beneficiaries had additional insurance that covered costs that were not covered by Medicare, the additional insurer needed to review the claim, ascertain the portion that Medicare paid, and determine whether it needed to pay the remainder under the terms of its insurance policy. Def.-Intervenor's Cross–Motion for Summ. J. at 6.

To coordinate benefit payments among Medicare as a primary payer and other insurers as secondary payers, the FIs and carriers negotiated "Trading Partner Agreements" with secondary health insurers. Decl. of Harry Gamble ¶ 6. Under these Trading Partner Agreements, secondary insurers provided FIs and carriers with a list of their insured, known as an eligibility file, and a list of claims selection choices. *Id.* The FI or carrier would check claims received from providers against a secondary insurer's eligibility file, and for each match, in exchange for a per-claim fee, would communicate Medicare primary payment information to the secondary insurer, allowing it to determine its liability and make its share of the payment to the provider. *Id.* The actual transmission of Medicare adjudicated claims data to a secondary supplemental insurer or payer is known as "crossover."[6] Pl.'s Reply to Def. and Def.-Intervenor's Opposition to HDM's Mot. For Partial Summ. J. and for Prelim. Inj. ("Pl.'s Reply") at 3.

5. Carriers are private entities that contract with CMS to process claims and make payments for Medicare Part B services, which cover physician and supply services and durable medical equipment, for a specified geographical area. Decl. of Harry Gamble ¶ 4; AR Tab 14 at 916, Statement of Work, Glossary. Fiscal intermediaries are entities that contract with CMS to determine and make payments for Medicare Part A services, which generally cover beneficiary hospital ex-

penses, as well as some Medicare Part B services, for a specified geographical area. Decl. of Harry Gamble ¶ 4; AR Tab 14 at 918, Statement of Work, Glossary.

6. The term "crossover" does not apply to situations in which Medicare acts as a secondary payer.

The system was not without its limitations. Some multi-state health insurers had a different agreement with each regional FI and carrier in order to obtain Medicare claims for all of its insureds. AR Tab 14 at 864, § 4.8, Coordination of Benefits Agreement. Because there were numerous regional FIs and carriers and many secondary insurers, there were an estimated 1300 to 1800 Trading Partner Agreements nationwide. Decl. of Harry Gamble ¶ 8. Consequently, the lines of communication between FIs and carriers and supplemental health insurers formed a complex web with many inefficiencies. *Id.* In addition, despite the large number of Trading Partner Agreements, not every supplemental health insurer had an agreement with every regional FI and carrier. Decl. of Peter Moore ¶ 7. If a beneficiary's supplemental insurer did not have a Trading Partner Agreement with the FI or carrier serving the region where the beneficiary had received health care services, the burden would fall upon the beneficiary to submit a claim to his or her insurance company. *Id.* Handling these claims, which were typically submitted in hard copy rather than electronically, was cumbersome and slow and resulted in delayed payments to providers. *Id.* Furthermore, even where Trading Partner Agreements were in place and claims could be submitted electronically, the system required each FI or carrier to have its own systems in place to exchange data with multiple supplemental insurers, leading to duplication of resources. *Id.* Supplemental insurers were not able to receive all of the Medicare claims paid data from a single FI or carrier, but instead received such data from multiple entities in multiple formats. *Id.*

Some supplemental insurers hired companies, known as "clearinghouses," to receive such data on their behalf. Decl. of Peter Moore ¶ 8. These clearinghouses received crossover claims data from FIs and carriers, sorted the data, and transmitted it to supplemental insurers. *Id.* Since 1998, plaintiff HDM Corp. ("HDM") has served as a clearinghouse for Medicare secondary claims. Pl.'s Statement of Facts ¶ 2. HDM has seven years of experience in Medicare crossover, currently processes approximately 30 million Medicare crossover claims a year, and is one of the two largest Medicare supplemental clearinghouses nationally based on the volume of crossover claims processed. *Id.* ¶¶ 4–5. In the course of developing its Medicare crossover business, HDM has invested in proprietary technology, including a product known as "Qwik + Cross®." *Id.* ¶ 6.

## II. The Coordination of Benefits Contract

On February 1, 1999, the U.S. Department of Health and Human Services invited companies to submit proposals for a COB contract. Decl. of Harry Gamble ¶ 11. The objective of the COB contract was to ensure that Medicare dollars were paid correctly, in the correct order, and to simplify and expedite the coordination of payments among primary and secondary payers. Def.'s Statement of Facts ¶ 1; Decl. of Harry Gamble ¶ 2. CMS sought to achieve these goals by consolidating the fragmented coordination of benefits operation into a simpler processes to be carried out using the assistance of fewer contractors. Decl. of Harry Gamble ¶ 2.

The Statement of Work ("SOW") for the COB contract stated that its purpose was to "establish a centralized Coordination of Benefits operation by consolidating under a single contractor entity the performance of all activities that support the collection, management, and reporting of other insurance coverage of Medicare beneficiaries." AR, Tab 14 at 780, Statement of Work, § 1.6, Objective of SOW. Section 1.6 of the Statement of Work further provided that:

> For the purposes of this SOW, COB embraces all of those activities necessary to ensure that the primary payer—whether it is Medicare, employer insurance or other insurance—pays first, and then makes arrangements for transferring the claims automatically to the secondary payer for further processing.

*Id.* The glossary for the SOW defined coordination of benefits as follows:

> COB means ensuring that the primary payer, whether it is Medicare or other insurance, pays first, and making arrangements for the claims to then be automatically transferred to the secondary payer

for further processing. It includes sending claims to Medigap insurers for secondary payment after Medicare has made a primary payment, crossing claims over to another insurer after Medicare has made a primary payment, and Medicare Secondary Payer situations where primary insurance is coordinated with Medicare.

AR Tab 14 at 917, Glossary.

To accomplish these broad objectives, the SOW identified four specific phases of work. AR Tab 14 at 790, § 3.1.4, Implementation Schedule. In Phase I, the COB contractor was to assume responsibility for collecting information about new Medicare beneficiaries' other insurance by issuing and collecting completed Initial Enrollment Questionnaires and transmitting the data to a common working file. Decl. of Peter Moore ¶ 12a; Def–Intervenor's Counter–Statement of Facts and Additional Facts ¶ 25. In Phase II, the COB contractor was to assume responsibility for the Data Match, which involved collecting information about Medicare beneficiaries' other insurance from various other organizations for the purpose of determining whether another insurer should pay primary to Medicare. Decl. of Peter Moore ¶ 12b; Def–Intervenor's Counter–Statement of Facts and Additional Facts ¶ 26. In Phase III, the COB contractor was to assume responsibility for MSP functions. Decl. of Peter Moore ¶ 12c; Def–Intervenor's Counter–Statement of Facts and Additional Facts ¶ 27. In Phase IV, the COB contractor was to assume responsibility for the Coordination of Benefits Agreements ("COBAs"). Decl. of Peter Moore ¶ 12c; Def–Intervenor's Counter–Statement of Facts and Additional Facts ¶ 28; AR Tab 14 at 863–64, § 4.8, Coordination of Benefits Agreement.

In Phase IV, which is at issue in this litigation, the COB contractor was responsible for negotiating, executing and maintaining standardized COBAs between CMS and secondary health insurers who wished to enter the program. AR Tab 14 at 864, § 4.8, Coordination of Benefits Agreement. These standardized COBAs were to replace the approximately 1300 Trading Partner Agreements between Medicare FIs and carriers and supplemental health insurers and to

standardize the way that eligibility and Medicare paid claims data was exchanged. *Id.* The COB contractor would receive eligibility files from secondary health insurers on a periodic basis identifying the Medicare beneficiaries for which these insurers paid benefits supplemental to Medicare. *Id.* at 867–68; § 4.8.1.5, Process Eligibility Files. This would replace the previous cumbersome process of having numerous eligibility files held by multiple FIs and carriers under multiple Trading Partner Agreements. Decl. of Harry Gamble ¶ 14. The COB contractor would make this eligibility information available to FIs and carriers in a centralized location, so that when they processed Medicare claims, they would be alerted to the need to have Medicare paid claims data submitted to the appropriate supplemental payers. Decl. of Peter Moore ¶ 12(e).

The COB contract was intended to correct many of the inefficiencies in place under the former system and was anticipated to provide numerous benefits. Decl. of Peter Moore ¶ 10. It would eliminate the duplication of resources and effort among the 51 FIs and carriers. *Id.* It would allow for the standardized, streamlined electronic processing of data, resulting in greater efficiency and fewer errors. *Id.* In addition, it would reduce burdens on Medicare beneficiaries whose supplemental insurers chose to enter COBAs because these beneficiaries would no longer need to submit paper claims where their supplemental insurer lacked an agreement with a regional FI or carrier. *Id.* This would also benefit health care providers, who could be paid more promptly and with less paperwork. *Id.*

### III. Award and Implementation of the COB Contract

CMS invited companies to submit proposals for the COB contract in accordance with the requirements of Request for Proposals No. HCFA–99–0004/DSS. AR Tab 4 at 11. Attached to and made part of the Request for Proposal cover sheet were answers to questions posed by prospective offerors regarding the COB contract entitled "Questions Received after COB Pre–Solicitation Conference." *Id.* at 14–32. Plaintiff HDM

did not submit a bid on the COB contract. Amended Compl. ¶ 29. Plaintiff alleges that its failure to submit a bid was attributable in part to two of the answers to the "Questions Received after COB Pre–Solicitation Conference." Pl.'s Mot. for Partial Summ. J. at 14; Transcript of Proceedings, *HDM Corp. v. United States*, 04–694C at 12–15 (Fed.Cl. Oct. 28, 2005)(" Tr."). Question and answer 10 stated:

> Q. 10. Will the COB Contractor be responsible for the creation of crossover claims files in addition to the negotiation, execution and maintenance of COBAs?
>
> A. 10. No. There are no plans for the COB Contractor to create crossover claims files. Initially, we plan for claims to continue to be crossed over by FIs and carriers. The "trigger" to do so will come from CWF.

AR Tab 4 at 15, Questions Received After COB Presolicitation Conference.

> Question and answer 12 stated:
>
> Q12. Since the contractor will be negotiating, executing and maintaining COBA's between [CMS] and health insurers for exchanging eligibility information and Medicare paid claims data, does this mean that contractors will have access to those files?
>
> A12. The COB contractor will not have access to these files; the COB contractor will have no use for them because the COB Contractor will only be negotiating these agreements, not actually crossing over paid claims information.

AR Tab 4 at 16, Questions Received After COB Presolicitation Conference.

The COB contract was awarded to defendant-intervenor GHI on November 1, 1999. AR Tab 13 at 720. As awarded, the contract was a "hybrid" contract, consisting of a cost-plus-award-fee component and an Indefinite Delivery/Indefinite Quantity ("IDIQ") component. AR Tab 13 at 721. The estimated price over the life of the contract for the items awarded on a cost-plus-fee basis was $[* * *], of which $[* * *] was allocated to the COBA portion of the contract. *Id.* at 722. The IDIQ portion of the contract was limited to a maximum of $[* * *] over the life of the contract, exclusive of costs and fees. *Id.* at 724.

The total contract award was for one base year and four option years. Decl. of Mark Werder ¶ 2. The base performance period extended from November 1, 1999 through October 31, 2000. AR Tab 13 at 729, F.3., Period of Performance. The option years extended for four one year periods, with option period 4 scheduled to terminate on October 31, 2004. *Id.* Contract provision H.1. provided for further contract renewal after the four option years had been exercised. Specifically, provision H.1. provided that:

> a. After all option periods as identified in Section F.3 have been exercised, the Contracting Officer may renew this contract by giving the Contractor written notice, 90 days prior to the expiration date of this contract, of its intent to do so. The contract renewal period of performance will be established at the time a renewal determination is made.
>
> b. The Contracting Officer may renew this contract without competition if—
>
> > 1. The Contractor continues to meet the requirements set forth in Subpart D of 42 C.F.R. Part 421, which can be found at 63 Federal Register 135980 (1998);
> >
> > 2. The Contractor meets or exceeds all of the performance requirements established in this contract; and
> >
> > 3. Renewal without competition is in the best interest of the Government.

AR Tab 13 at 742, H.1., Contract Renewal.

In the course of performing Phases I through III of the COB contract, defendant-intervenor encountered substantially higher data volumes than had been anticipated, particularly in regard to Phase III. Decl. of Peter Moore ¶ 15. In addition, CMS's preparation for Y2K and the resulting backlog of systems modifications that were put on hold as a result caused postponement of Phases III and IV. Decl. of Harry Gamble ¶ 12. Regulatory and legislative developments also affected the implementation timeframes. Decl. of Peter Moore ¶ 16. Under the Administrative Simplification provisions of the

Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Congress required that all health care data exchanges be made electronically using a common standard, but did not specify the standard to be used. Decl. of Peter Moore ¶ 16; Pub.L. 104–191, 110 Stat.1936 (1996), Title II, Subtitle F, codified at 42 U.S.C. § 1320(d) through § 1320(d)(8) (2000) and 42 U.S.C. § 242k(k) (2000). In 2000, regulations were issued identifying the required standards promulgated by the American National Standards Institute ("ANSI"). *See* 65 Fed.Reg. 50,312 (Aug. 17, 2000) (amending 45 C.F.R. parts 160 and 162). As a result, defendant-intervenor was required to develop systems and processes to ensure that certain electronic data exchanges complied with the ANSI standard. Decl. of Peter Moore ¶¶ 16, 18. These factors all contributed to a delay in the implementation of the COBA phase of the contract until April 2004. Decl. of Harry Gamble ¶ 12.

As a result of these delays, the contract was automatically renewed pursuant to contract section H.1. and 42 U.S.C. § 1395ddd(d)(3) (2000) to allow for an additional two-year period to permit defendant-intervenor to complete the Phase IV contract tasks. Decl. of Mark Werder ¶ 2; Tr. at 80. 42 U.S.C. 1395ddd(d)(3) provides:

> (d) The Secretary [of HHS] shall enter into contracts under the [Medicare Integrity] Program in accordance with such procedures as the Secretary shall by regulation establish, except that such procedures shall include the following:
>
> \* \* \* \* \* \*
>
> (3) Procedures under which a contract under this section may be renewed without regard to any provision of law requiring

competition if the contractor has met or exceeded the performance requirements established in the current contract.

The current extension of the COB contract will conclude on October 31, 2006. Tr. at 80. At that point, CMS will have the option to extend the contract again if it believes that it is in the Government's best interests to do so. *Id.* at 131. However, defendant has represented that CMS presently intends to begin the process of re-bidding the COB contract in January 2006, and for the re-award, if any, to take place simultaneously with the expiration of the current contract. *Id.* at 132–133.

## IV. Modification 30 to the COB Contract

On September 30, 2003, CMS issued Modification 30 to the COB contract. AR Tab 44 at 1131. Modification 30, which was made pursuant to FAR 52.243–2, replaced Section 4.8 of the SOW as originally set forth with a revised Section 4.8.[7] AR Tab 44 at 1132. Modification 30 required, among other things, that:

> [t]he COB contractor shall provide a plan to CMS to accomplish the activities associated with obtaining signed COBAs and transitioning the claims crossover function that includes simultaneously: 1) converting all existing TPAs, maintained by approximately 47 Medicare fee-for-service contractors, to national COBAs no later than October 1, 2004, **and** working to obtain new business through the marketing and execution of national COBAs; 2) assuming the claims-based crossover process; 3) assuming the crossover fee billing function; and 4) addressing any other crossover workload that needs to be transitioned.

---

7. FAR 52.243–2, 48 C.F.R. 52.243–2 (2002) provided in relevant part that:

(a) The Contracting Officer may at any time, by written order, and without notice to the sureties, if any, make changes within the general scope of this contract in any one or more of the following:
(1) Drawings, designs, or specifications when the supplies to be furnished are to be specially manufactured for the Government in accordance with the drawings, designs, or specifications.
(2) Method of shipment or packing.
(3) Place of delivery.
(b) If any such change causes an increase or decrease in the estimated cost of, or the time required for, performance of any part of the work under this contract, whether or not changed by the order, or otherwise affects any other terms and conditions of this contract, the Contracting Officer shall make an equitable adjustment in the (1) estimated cost, delivery or completion schedule, or both; (2) amount of any fixed fee; and
(3) other affected terms and shall modify the contract accordingly.

AR Tab 44 at 1139–40, § 4.8.2.1, COBA Work Plan (emphasis in original).

Modification 30 was designed to consolidate the Medicare paid claims transfer function from multiple government contractors to a single government contractor so that each secondary insurer would receive one claim file, rather than multiple files from multiple FIs and carriers. Decl. of Harry Gamble ¶ 19. Previously, FIs and carriers had included inclusion and exclusion logic in their systems to ensure that trading partners only received those claim types specified in the agreements they had with the FIs and carriers. AR Tab 73 at 1679, CMS Manual System Pub. 100–04, Transmittal 28. Under the new process, the COB contractor would assume responsibility for centralizing the transmission of bundled claims to supplemental insurers. *Id.* This would reduce burdens on supplemental insurers, who would no longer need to receive multiple claims files from multiple FIs and carriers in multiple formats. Decl. of Peter Moore ¶ 10.

Modification 30 was issued prior to implementation of the COBA phase of the COB contract. *See* Decl. of Harry Gamble ¶ 12. It initially increased the value of the third option period of the COB contract by $[* * *]. AR, Tab 44 at 1131.[8] Defendant asserts that this is as close an estimate as it can provide for the total cost of the crossover function, although there may have been a small number of additional costs incurred. Tr. at 55–56. Since Phase IV implementation began, several modifications have been issued increasing the reimbursable amount for the tasks associated with this portion of the COB contract. Decl. of Mark Werder ¶ 4. CMS has not created separate accounting entries to quantify the portion of the increases in the cost of Phase IV attributable to Modification 30 and those tasks in Phase IV that pre-dated Modification 30. *Id.* Defendant-intervenor estimates that the cost to consolidate the activities involved in Medicare crossover is no more than 10% of the COBA portion of the contract. Decl. of Peter Moore ¶ 14.

CMS has signed contracts with approximately 129 supplemental insurers to support the new information transfer system.[9] Decl. of Joan Fowler ¶ 3. Four trading partners are currently in live production and have cancelled their local agreements and terminated their legacy systems.[10] Decl. of Joan Fowler ¶ 4; Tr. at 87–88. There are 125 additional trading partners who have signed the COBA agreement and are in beta or parallel testing.[11] Decl. of Joan Fowler ¶ 4; Tr. at 87–88. Supplemental insurers who have signed COBAs have invested in training and testing to prepare for implementation of the new process. Decl. of Peter Moore ¶ 20e. In addition, many of the COBA partners have participated in weekly conference calls with CMS to discuss operational issues associated with COBA testing. Decl. of Joan Fowler ¶ 4. Furthermore, all COBA partners have identified or completed systems changes at corporate expense to accept and process HIPAA-compliant claims that will be submitted through the COBA process. *Id.* Fiscal intermediaries and carriers have been advised to plan for the elimination or scaling back of most of their staff who supported the former crossover process. Def.'s Cross–Mot. for Summ. J. at 38, Tr. at 90.

---

8. This amount was subsequently decreased by $[* * *] in Modification 30 to $[* * *]. AR Tab 45 at 1206.

9. The declaration of Joan Fowler dated September 26, 2005 stated that CMS had signed contracts with over 120 supplemental insurers. At oral argument on October 28, 2005, counsel for defendant-intervenor indicated that the number had increased to at least 129. Tr. at 87–88.

10. The declaration of Joan Fowler dated September 26, 2005 stated that three partners were in live production and had cancelled their local agreements and terminated their legacy systems.

At oral argument on October 28, 2005, counsel for defendant-intervenor stated that four partners were then in live production and had cancelled their local agreements and terminated their legacy systems, and that an additional trading partner was expected to do so the following week. Tr. at 87.

11. The declaration of Joan Fowler dated September 26, 2005 stated that 117 trading partners were currently in beta or parallel testing. At oral argument on October 28, 2005, counsel for defendant-intervenor stated that the number had increased to 125. Tr. at 88.

## V. The Nature of Plaintiff's Claims

On April 29, 2004, plaintiff brought suit in the Court of Federal Claims alleging that the consolidation of the Medicare claims crossover function would force HDM out of business and destroy the value of its proprietary technology in violation of the Just Compensation Clause of the Fifth Amendment. Compl. ¶ 33. Plaintiff's taking claim is not the subject of the cross-motions for judgment on the administrative record or the motion for preliminary injunction presently before the Court.

On February 8, 2005, plaintiff amended its complaint to add two claims against defendant for alleged violations of the Competition in Contracting Act ("CICA"), 41 U.S.C. § 253 (2000). Am. Compl. ¶¶ 19, 53. Plaintiff's second and third claims for relief (set forth in Counts II and III) allege that defendant improperly modified and extended the scope of the COB contract to include Medicare crossover claims without first going through the required competitive bidding process. Am. Compl. ¶¶ 19, 53.

On May 9, 2005, plaintiff filed, "pursuant to RCFC 56.1," a Motion for Partial Summary Judgment as to its second and third claims for relief against defendant. Pl.'s Mot. For Part. Summ. J. at 1. Plaintiff requested that the Court declare Modification 30 and all other modifications to the COB contract relating to the crossover consolidation void. Id. Plaintiff also requested that the Court issue a permanent injunction prohibiting defendant from implementing or proceeding under any modification to the COB contract relating to the crossover consolidation and requiring defendant to conduct competitive bidding for the crossover consolidation services. Id. at 2.

On September 14, 2005, plaintiff filed a Motion for Preliminary Injunction requesting that the Court enjoin defendant and its agents from implementing consolidation of the Medicare crossover process at any time prior to the Court's ruling on plaintiff's Motion for Partial Summary Judgment. Pl.'s Mot. for Prelim. Inj. at 1. Plaintiff also requested that the Court enjoin defendant and its agents from communicating with any of plaintiff's clients regarding the crossover process (other than to notify them of the injunction) at any time prior to the Court's ruling on plaintiff's Motion for Partial Summary Judgment. Id. at 1–2.

On September 29, 2005, defendant filed a Cross–Motion for Partial Judgment upon the Administrative Record as to plaintiff's second and third claims for relief. On September 30, 2005, defendant-intervenor also filed a Cross–Motion for Partial Summary Judgment with respect to the same claims. The Court has treated that motion as one for judgment on the administrative record pursuant to RCFC 56.1.

## DISCUSSION

### I. Jurisdiction

The Court has jurisdiction over plaintiff's bid protest action pursuant to the Tucker Act, which provides in relevant part:

(1) The United States Court of Federal Claims ... shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement ....

28 U.S.C. § 1491(b) (2000), amended as of January 1, 2001 by Pub.L. No. 104–320 § 12(d), 110 Stat. 3870.

In this case, plaintiff is not challenging an award, but rather, claims that there has been a violation of statutory requirements for competition in government procurements. These types of actions, asking the court to direct new solicitation of and competition for, government contract work due to a cardinal change in a previously-awarded contract, are within this court's jurisdiction. *CW Gov't Travel v. United States,* 61 Fed.Cl. 559, 567 (2004), *reh'g denied,* 63 Fed.Cl. 459 (2005), *aff'd,* No. 05–5051, 2005 WL 3292539 (Fed. Cir. Dec.6, 2005); *Northrop Grumman Corp. v. United States,* 50 Fed.Cl. 443, 455 (2001); *see also CCL, Inc. v. United States,* 39 Fed. Cl. 780, 789 (1997) ("The new language permits both a suit challenging government ac-

tion which is self-consciously a competitive procurement as well as what [plaintiff] is claiming here: that [defendant] is procuring goods and services through a process that should have been the subject of competition; and that the failure to compete the procurement is in violation of law.").

The court reviews challenged agency decisions, such as agency actions of the sort challenged here, under the standards in the Administrative Procedure Act (APA), 5 U.S.C. § 706 (2000); 28 U.S.C. § 1491(b)(4). Pursuant to the APA, a reviewing court is directed to overturn agency actions that are "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law . . . .". 5 U.S.C. § 706(2). To prevail in a bid protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it. *Northrop Grumman*, 50 Fed.Cl. at 457.

## II. The Standard for Judgment on the Administrative Record

The parties have submitted cross-motions for judgment on the administrative record pursuant to RCFC 56.1.[12] Judgment on the administrative record pursuant to RCFC 56.1 is a procedural tool unique to the Court of Federal Claims with no counterpart in the Federal Rules of Civil Procedure. *Banknote Corp. of America, Inc. v. United States*, 365 F.3d 1345, 1352 (Fed.Cir.2004); *Night Vision Corp. v. United States*, 68 Fed.Cl. 368, 391 (2005). The standard for decision on a motion for judgment on the administrative record, pursuant to RCFC 56.1, is similar but not identical to a motion for summary judgment under Federal Rule of Civil Procedure ("FRCP") 56. *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1355 (Fed.Cir.2005); *Hawkins v. United States*, 68 Fed.Cl. 74, 81 (2005), *Tech. Systems, Inc. v. United States*, 50 Fed.Cl. 216, 222 (2001) ("A motion for

judgment on the administrative record is not a true motion for summary judgment.") The court's inquiry on a motion for summary judgment under RCFC 56 or FRCP 56 is whether the moving party has proved its case as a matter of fact and law or whether a genuine issue of material fact precludes judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In contrast, the standard for judgment on the administrative record pursuant to RCFC 56.1 is narrower, *i.e.*, given all the disputed and undisputed facts, whether plaintiff has met the burden of proof to show that the decision was not in accordance with the law. *Lewis v. United States*, 67 Fed.Cl. 158, 162 (2005); *Park Tower Mgmt., Ltd. v. United States*, 67 Fed.Cl. 548, 560 (2005).

RCFC 56.1 is "a rule designed to provide for trial on a paper record, allowing for fact-finding by the trial court." *Night Vision Corp.*, 68 Fed.Cl. at 391 (quoting *Bannum*, 404 F.3d at 1356). Under RCFC 56.1, the existence of a fact question neither precludes granting a motion for judgment nor requires the court to conduct a full evidentiary hearing. *Carlisle v. United States*, 66 Fed.Cl. 627, 631 (2005). Instead, the Court is required to make factual findings from the record evidence and render a decision based upon those factual findings. *Bannum*, 404 F.3d at 1353–54; *Argencord Mach. & Equip., Inc. v. United States*, 68 Fed.Cl. 167, 172 n. 12 (2005).

## III. Modification 30 Did Not Constitute A Cardinal Change to the COB Contract

■■■ CICA requires executive agencies, when procuring property or services, to "obtain full and open competition through the use of competitive procedures." 41 U.S.C. § 253(a)(1)(A) (2000). Modifying the contract so that it materially departs from the scope of the original procurement violates CICA by preventing potential bidders from participating or competing for what should be a new procurement. *AT & T Comm., Inc.*

---

**12.** On August 19, 2005, the Court granted the parties leave to supplement the administrative record. The Court permitted additional supple-
mentation pursuant to its Orders of September 30, 2005 and October 27, 2005.

*v. Wiltel*, 1 F.3d 1201, 1205 (Fed.Cir.1993); *CW Gov't Travel, Inc. v. United States*, 61 Fed.Cl. at 573; *CESC Plaza Ltd. P'ship v. United States*, 52 Fed.Cl. 91, 93 (2002). CICA, however, does not prevent modification of a contract by requiring a new bid procedure for every change. *Wiltel*, 1 F.3d at 1205. Rather, only modifications outside the scope of the original competed contract fall under the statutory competition requirement. *Id.; Cardinal Maint. Serv., Inc. v. United States*, 63 Fed.Cl. 98, 106 (2004).

■ CICA itself does not set forth a standard for determining when modification of an existing contract requires a new competition or falls within the scope of the original competitive procurement. *Wiltel*, 1 F.3d at 1205; *Cardinal Maint.*, 63 Fed.Cl. at 106. The Federal Circuit has adopted the doctrine of "cardinal change" as the standard for determining whether a contract modification runs afoul of the competition requirements of CICA. *Wiltel*, 1 F.3d at 1205; *see also Northrop Grumman Corp.*, 50 Fed.Cl. at 465. "[A] cardinal change ... occurs when the government effects an alteration in the work so drastic that it effectively requires the contractor to perform duties materially different from those originally bargained for." *Wiltel*, 1 F.3d at 1205 (quoting *Allied Materials & Equip. Co. v. United States*, 215 Ct.Cl. 406, 409, 569 F.2d 562, 563–64 (1978)). Whether a cardinal change has occurred presents questions of contract interpretation that the court may rule upon as a matter of law. *Northrop Grumman*, 50 Fed.Cl. at 458; see also *CW Gov't Travel*, 61 Fed.Cl. at 571 ("Interpretation of the terms of a government contract is a question of law to be decided by the court."). In the present case, the relevant inquiry is whether Modification 30 changed the contract so profoundly as to circumvent the statutory requirement of competition.

**A. Modification 30 Did Not Materially Change the Scope of the COB Contract and Was Consistent With Its Broad Objective**

■ In determining whether a modification falls within CICA's competition requirement, the Court examines whether the con-

tract as modified is materially different from the original contract *Wiltel*, 1 F.3d at 1205; *Cardinal Maint.*, 63 Fed.Cl. at 106. The analysis thus focuses on the scope of the entire original procurement in comparison to the scope of the contract as modified. *Wiltel*, 1 F.3d at 1205; *CW Gov't Travel*, 61 Fed.Cl. at 574, *CCL, Inc.*, 39 Fed.Cl. at 791 ("Whether a given modification is within the scope of the original contract is determined by comparing the modified contract with the scope of the competition conducted to achieve the original contract."). One relevant factor is whether the modification substantially changed the type of work to be performed under the original contract. *CW Gov't Travel*, 61 Fed.Cl. at 574; *CESC Plaza*, 52 Fed.Cl. at 93. A broad original competition may validate a broader range of later modifications without further bid procedures. *Wiltel*, 1 F.3d at 1205.

■ In this case, the language employed in the SOW reflects a broad contractual objective. The "Objective of Work" section of the Statement of Work for the COB contract stated that:

[CMS] is seeking to establish a centralized Coordination of Benefits operation by consolidating under a single contractor entity the performance of all activities that support the collection, management, and reporting of other insurance coverage of Medicare beneficiaries. Such activities are currently being performed by disparate contractors throughout the United States. A single COB contractor will be responsible for performing all of these activities in the future.

AR Tab 14 at 780, § 1.6, Objective of SOW.

The transmission of Medicare adjudicated claims data to secondary supplemental insurers is encompassed within "all activities that support the collection, management, and reporting of other insurance coverage of Medicare beneficiaries." In addition, assigning this task to the COB contractor is consistent with the statement that a single COB contractor would be responsible for performing "all of these activities" in the future. Therefore, consolidating the crossover function in the COB contractor is consistent with the broad objectives of the COB contract.

The "Objective of Work" section further provided that:

> For the purposes of this SOW, COB embraces all of those activities necessary to ensure that the primary payer—whether it is Medicare, employer insurance or other insurance—pays first, and then makes arrangements for transferring the claims automatically to the secondary payer for further processing. *Id.*

The Court finds that consolidating responsibility for the crossover function with the COB contractor is consistent with this objective as well. Plaintiff points to the language in this section stating that the COB contractor "makes arrangements" for transferring claims to supplemental insurers as evidence that the original COB contract intended that the contractor would be limited to a support role in the crossover process. Pl.'s Reply at 5, *see also* AR Tab 14 at 780, § 1.6, Objective of SOW. The Court disagrees, and finds that the actual transmission of Medicare adjudicated claims data is consistent with making arrangements for transferring such claims. However, even if the original contract had limited the COB contractor to a support role in transferring Medicare adjudicated claims, it is not sufficient for plaintiff to show that this responsibility changed. Rather, plaintiff must demonstrate that the changed contract is materially different from the competed contract. *Wiltel,* 1 F.3d at 1205.

The glossary for the SOW affirms that consolidating the crossover function is consistent with the COB contract's objectives. The glossary defines coordination of benefits as follows:

> COB means ensuring that the primary payer, whether it is Medicare or other insurance, pays first, and making arrangements for the claims to then be automatically transferred to the secondary payer for further processing. It includes sending claims to Medigap insurers for secondary payment after Medicare has made a primary payment, crossing claims over to another insurer after Medicare has made a primary payment, and Medicare Secondary Payer situations where primary insurance is coordinated with Medicare.

AR Tab 14 at 917, Glossary. This definition specifically includes "crossing claims over to another insurer," as a function encompassed within coordination of benefits. In light of this, it is difficult to see how consolidating the crossover function could be incompatible with the objectives of the original contract.

Plaintiff argues that the glossary definition of coordination of benefits should not be considered in interpreting the "Objectives of Work" section because the definition was not cross-referenced in that section and because the "Objectives of Work" section provides its own definition of coordination of benefits. Pl.'s Reply at 6–7. The "definition" of coordination of benefits in Section 1.6 that plaintiff alleges should control is as follows:

> For the purposes of this SOW, COB embraces all of those activities necessary to ensure that the primary payer—whether it is Medicare, employer insurance or other insurance—pays first, and then makes arrangements for transferring the claims automatically to the secondary payer for further processing.

AR Tab 14 at 780, Statement of Work § 1.6, Objective of SOW. Plaintiff claims that because the phrase "crossing claims over to another insurer" is not included within the "Objective of Work" section itself, the crossover consolidation was not within the SOW's objectives.

The Court does not find plaintiff's argument compelling. At the outset, the Court is not inclined to disregard the glossary definition of coordination of benefits, when the glossary was clearly included in the SOW for the purpose of defining the terms therein. Furthermore, the Court does not find the definition of coordination of benefits in the glossary for the SOW to be inconsistent with the definition contained in the "Objectives of Work" section. The glossary definition employs essentially the same language as the "Objectives of Work" section, but simply proceeds to supplement the general definition with specific examples of activities that fall within coordination of benefits. In comparison, the "Objectives of Work" section simply states that coordination of benefits "embraces" certain activities, indicating that

these activities were not intended to be an exhaustive list.

However, even if the Court were to disregard the glossary definition of coordination of benefits, the Court would still find that Modification 30 was consistent with the scope of the original COB contract. It is not necessary that the crossover function be specifically enumerated within the definition of COB for its addition to be consistent with the objectives of the COB contract. As previously discussed, the Court finds that the objective of COB set forth in Section 1.6 of the SOW standing alone supports the conclusion that Modification 30 did not materially depart from the scope of the original contract.

Plaintiff also argues that testimony of the COB contract Project Officer, Harry Gamble, demonstrates that Modification 30 materially departed from the scope of the original COB contract. Pl.'s Reply at 12. Mr. Gamble stated that crossover consolidation "was not in the original statement of work ... the final act of actually transmitting the claim was not going to be one of [the COB contractor's] functions." Gamble Dep. 183:20–184:20. Again, plaintiff's arguments are focused on proving that the crossover consolidation was not contained in the original COB contract. The Court agrees, but finds that this is insufficient to demonstrate that Modification 30 was a cardinal change. As previously discussed, the relevant question is not whether Modification 30 changed the COB contract, but rather, whether it effected a cardinal change by materially changing the work to be performed under the contract. *Wiltel,* 1 F.3d at 1205; *Cardinal Maint.,* 63 Fed.Cl. at 106. The Court finds that it did not, because consolidating the transfer of Medicare adjudicated claims data is consistent with the contract's broad objective of consolidating the performance of all activities that support the collection, management, and reporting of other insurance coverage of Medicare beneficiaries under a single contractor entity.

**B. Modification 30 Did Not Significantly Change the Performance Period or Cost of the COB Contract**

In determining whether a change was a cardinal change, courts also look to changes in the performance period and cost between the contract as awarded and modified. *Cardinal,* 63 Fed.Cl. at 106; *CESC Plaza Ltd.,* 52 Fed.Cl. at 93. Plaintiff alleges that Modification 30 significantly extended both the performance period and cost of the COB Contract. Pl.'s Mot. for Partial Summ. J. at 24–26; Pl.'s Mot. for Prelim. Inj. at 24–26.

Plaintiff notes that the original implementation date for the COBA portion of the COB contract was scheduled for October 2, 2000, and that by the expiration of that date, no crossover consolidation had been performed. Pl.'s Mot. for Summ. J. at 24, Pl.'s Mot. for Prelim. Inj. at 24. Plaintiff then alleges that the COB contract was subsequently extended through October 31, 2006 to allow for implementation of the COBA phase. Pl.'s Mot. for Summ. J. at 24, Pl.'s Mot. for Prelim. Inj. at 24. However, plaintiff has failed to demonstrate that the delay in implementing the COBA phase is attributable to the crossover consolidation. In fact, the record contains substantial evidence that the COBA phase was delayed by other factors. As previously discussed, defendant-intervenor encountered substantially higher data volumes than anticipated during Phase III of the contract. Decl. of Peter Moore ¶ 15. In addition, CMS's preparation for Y2K caused many system modifications to be put on hold, delaying Phases III and IV. Decl. of Harry Gamble ¶ 12. Regulatory changes, such as the requirement of certain ANSI-compliant data exchanges under HIPAA, also contributed to the delay. Decl. of Peter Moore ¶ 16. Additional time spent on performance of a contract is within the scope of the contract when it is due to problems with the completion of performance. *Northrop Grumman,* 50 Fed.Cl. at 466. Therefore, plaintiff has failed to present evidence of a cardinal change through an increased performance period between the original COB contract and the COB contract as modified.

Plaintiff also alleges that Modification 30 significantly increased the cost of the COB contract. Pl.'s Mot. For Partial. Summ. J. at 25; Pl.'s Mot. for Prelim. Inj. at 25. Plaintiff claims that Modification 30 increased the cost of the COBA portion of the

COB contract from $[* * *] after the contract was initially awarded to $[* * *]. Pl.'s Mot. For Partial. Summ. J. at 25; Pl.'s Mot. for Prelim. Inj. at 25. Plaintiff also claims that approximately $[* * *] has been spent to implement the crossover consolidation for the fiscal year 2005 alone. Pl.'s Mot. for Partial Summ. J. at 26; Pl.'s Mot. for Prelim. Inj. at 26.

The cost figures cited by plaintiff refer to the cost of the COBA portion of the contract as a whole, not to the increase in the cost of the COBA portion as a result of Modification 30. Modification 30 initially increased the value of option period 3 of the COB contract by $[* * *]. AR, Tab 44 at 1131.[13] Defendant-intervenor has presented evidence that the cost of the crossover consolidation is no more than 10% of the cost of COBA portion of the contract, and that the cost of the COBA portion of the contract is no more than 15% of the cost of the COB contract as a whole. Decl. of Peter Moore ¶ 14. However, even if the $[* * *] figure cited by plaintiff were accurate, plaintiff has not presented evidence of ·a cardinal change. Defendant stated that the total cost of the COB contract was in excess of $[* * *] over five years.[14] Tr. at 56. Based upon defendant's estimate of the total contract cost, even if the crossover consolidation added $[* * *] for fiscal year 2005, this would represent just a 3% increase in the cost of the contract overall. Accordingly, plaintiff has also failed to present evidence of a cardinal change through an increase in cost between the original COB contract and the COB contract as modified.

## C. A Reasonable Offeror Would Have Expected Modification 30 to Fall Within the COB Contract's Changes Clause

A modification generally falls within the scope of the original procurement if potential bidders would have expected it to fall within the contract's changes clause. *Wiltel,* 1 F.3d at 1205; *CW Gov't Travel,* 61 Fed.Cl. at 574. Plaintiff alleges that prospective offerors

could not have reasonably anticipated that the COB ·contract would be modified to include the crossover consolidation. Pl.'s Mot. for Prelim. Inj. at 11–24. In support of this contention, plaintiff has presented extensive evidence that the crossover consolidation was not included in the original COB contract. *Id.* at 17–21. This rather circular argument ignores the relevant inquiry. The question is not whether the contract was changed, but whether a potential offeror would have "anticipated that it could also be called upon under the changes clause" to provide the ·additional services. *CW Gov't Travel,* 61 Fed.Cl. at 574.

The SOW for the COB contract contained significant language that alerted prospective offerors to the possibility of subsequent changes in the specific work required to accomplish the contract's broad objectives. For example, section 3.0 of the SOW required that "[t]he COB contractor shall also have the capability to adapt to a dynamic operational and technological environment." AR Tab 14 at 785–86, § 3, General Requirements. Section 4.8.1.2 of the SOW provided that "[t]he COB contractor shall process requests from COBA insurers . . . and perform other tasks necessary to effective administration of these agreements." AR Tab 14 at 866, § 4.8.1.2., Process COBA Requests. Section 4.10 of the SOW provided that "[t]he COB contractor shall provide, in addition to the program-specific reports previously identified, an annual Future Enhancements Report that covers any recommended changes or improvements." AR Tab 14 at 872, § 4.10 COB Future Enhancement Report. Having read these sections, no reasonable prospective offeror could have believed that the tasks to be performed by the COB contractor would remain static.

Plaintiff further relies upon question and answer 10 of the "Questions Received after COB Pre–Solicitation Conference" to support its contention that a reasonable offeror would

---

**13.** This amount was subsequently decreased by $[* * *] in Modification 30 to $[* * *]. AR Tab 45 at 1206.

**14.** In defendant's filings, defendant stated that the total cost of the contract was in excess of

$[* * *]. Def.'s Mot. For Partial J. Upon the Administrative Record at 31. At the October 28, 2005 argument before the Court, counsel for defendant represented that amount had increased to $[* * *]. Tr. at 56.

not have expected crossover consolidation to fall within the COB contract's changes clause. Pl.'s Mot. For Partial. Summ. J. at 14; Pl.'s Mot. for Prelim. Inj. at 14–15. Question and answer 10 provided:

Q. 10. Will the COB Contractor be responsible for the creation of crossover claims files in addition to the negotiation, execution and maintenance of COBAs?

A. 10. No. There are no plans for the COB Contractor to create crossover claims files. Initially, we plan for claims to continue to be crossed over by FIs and carriers. The "trigger" to do so will come from CWF.

AR, Tab 4 at 15, Questions Received After COB Presolicitation Conference. Plaintiff claims that the response to question 10 would lead a reasonable offeror to believe that the claims crossover function would not be consolidated in the COB contractor pursuant to the changes clause of the COB contract. Pl.'s Mot. For Partial. Summ. J. at 14; Pl.'s Mot. for Prelim. Inj. at 14–15.

Plaintiff also argues that the testimony of the COB contract Project Officer, Harry Gamble regarding the meaning of the answer to question 10 supports the position that Modification 30 was a cardinal change. Pl.'s Mot. for Prelim. Inj. at 12–14. Mr. Gamble's testimony was as follows:

Q. So if a prospective bidder received this [Q & A] and asked whether or not they would be responsible for creation of crossover claim files, the answer they were given is no, correct?

A. Yes.

Q. Would it be fair to say that a prospective bidder would have no reason to believe that their bids should include crossing of claims?

A. Yes.

Gamble Dep. 47:5–48:14; *see also* Pl.'s Mot. For Partial Summ. J. at 11.

At oral argument, for the first time, plaintiff also identified question and answer 12 of the "Questions Received after COB Pre–Solicitation Conference" as a "smoking gun" that would demonstrate that consolidation of the claims crossover function could not reasonably be expected to fall within the COB contract's changes clause. Tr. at 12–14. The Court considered this argument, although plaintiff was unable to provide a satisfactory explanation for why it was not raised prior to oral argument in plaintiff's numerous briefs. Question and answer 12 stated:

Q12. Since the contractor will be negotiating, executing and maintaining COBA's between [CMS] and health insurers for exchanging eligibility information and Medicare paid claims data, does this mean that contractors will have access to those files?

A12. The COB contractor will not have access to these files; the COB contractor will have no use for them because the COB Contractor will only be negotiating these agreements, not actually crossing over paid claims information.

AR, Tab 4 at 16, Questions Received After COB Presolicitation Conference.

The Court does not consider Question 12 to be a "smoking gun." Question 10, Question 12, and Mr. Gamble's testimony simply indicate that initially, CMS did not intend to include the specific task of crossover consolidation within the COB contract. However, simply because a task is not included in the original contract does not mean that it is not within the permissible scope of contract modifications.[15] Although prospective offerors were told that crossover would not initially be included in the COB contract, the eventual consolidation of the crossover function in

---

15. Defendant and defendant-intervenor also argued that under Modification 30, the COB contractor still does not "create" crossover claims files, but rather translates the files from one format into another. Def.'s Reply to Pl.'s Opposition to Def.'s Cross–Motion for Partial Judgment Upon the Administrative Record at 3 n. 2; Def.-Intervenor's Reply in Support of Motion for Partial Summary Judgment on Counts II and III at 3. Plaintiff responded by asserting that in applying claims inclusion and exclusion selection logic, the COB contractor would, in fact, be creating new and/or altered crossover claim files. Pl.'s Reply at 8, Aff. of Lisa Lechowicz at ¶ 8. At oral argument on October 28, 2005, counsel for plaintiff stated that it was unnecessary for the Court to resolve this issue in order to rule on the cross-motions. Tr. at 9–10. The Court agrees, and does not believe that further argument regarding the exact meaning of the word "create" in this context would have materially affected the resolution of the issues before the Court.

the COB contractor was not a cardinal change. As discussed *supra* at Section III. A., consolidating the crossover function is consistent with the contract's broad objective of "consolidating under a single contractor entity the performance of all activities that support the collection, management, and reporting of other insurance coverage of Medicare beneficiaries." AR Tab 14 at 780, Statement of Work § 1.6, Objective of SOW. Plaintiff has failed to identify any reason that CMS would have intended to exclude the crossover consolidation from this broad objective. If plaintiff's position were correct, the SOW would implicitly call for the centralization of all coordination of benefits activities *except* claims crossover. Logically, it would make no sense to exclude the transmission of Medicare paid claims data to supplemental insurance companies from the broad goal of consolidating "all activities" in a single contractor.

Furthermore, the SOW contained significant language, discussed *supra* at 257, alerting prospective bidders that the specific methods of meeting the contract's objectives were likely to change and evolve. Furthermore, the qualifying language in the answer to Question 10 that "initially" claims would continue to be crossed over by FIs and carriers should have put prospective bidders on notice that it would be unreasonable to assume that responsibility for this specific task would not in time be added to the duties of the COB contractor in the interest of "consolidating, under a single contractor entity the performance of all activities that support the collection, management, and reporting of other insurance coverage of Medicare beneficiaries." *See* AR, Tab 14 at 780, § 1.6, Objective of SOW. On the contrary, a reasonable bidder would have anticipated the likelihood that the claims crossover function would in the future be consolidated in the COB contractor pursuant to the contract's changes clause.

## IV. Alternately, Even if Plaintiff Had Established that Modification 30 Constituted a Cardinal Change, the Court Would Still Deny Plaintiff's Request for Injunctive Relief

Injunctive relief is an extraordinary remedy. *CACI, Inc.-Federal v. United States*, 719 F.2d 1567, 1581 (Fed.Cir.1983); *LABAT-Anderson, Inc. v. United States*, 65 Fed.Cl. 570, 576 (2005). The Court may issue a permanent injunction if plaintiff establishes that: (1) it has achieved actual success on the merits; (2) it will suffer irreparable injury if injunctive relief is not granted; (3) the harm to plaintiff if an injunction is not granted outweighs the harm to the Government if an injunction is granted; and (4) granting the injunction serves the public interest. *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed.Cir.2004); *Int'l Res. Recovery, Inc. v. United States*, 64 Fed.Cl. 150, 159 (2005); *CW Gov't Travel*, 61 Fed.Cl. at 575. No single factor taken individually is necessarily dispositive. *CW Gov't Travel*, 61 Fed.Cl. at 575.

If plaintiff had established that Modification 30 were a cardinal change, plaintiff would have achieved success on the merits. "[A] party suffers irreparable injury when it loses the opportunity to compete on a level playing field with other bidders." *Cardinal Maint.*, 63 Fed.Cl. at 110; *see also Overstreet Elec. Co. v. United States*, 47 Fed.Cl. 728, 744 (2000) ("[T]he potential loss of valuable business on [a] contract … deriving from a lost opportunity to compete in a fair competitive bidding process … has been found sufficient to prove irreparable harm."). Therefore, if plaintiff had established that the crossover consolidation should have been competed, plaintiff would have established that it was irreparably harmed in being denied the opportunity to compete for the work. However, even if the Court were to rule in favor of plaintiff on these two factors, the Court would still deny plaintiff's request for injunctive relief based upon the Court's consideration of the balance of harms and the public interest. *See PGBA*, 389 F.3d at 1226, 1229–32; *CW Gov't Travel*, 61 Fed.Cl. at 577–79.

## A. The Balance of Harms

The Court finds that the balance of harms weighs against granting an injunction. Plaintiff claims that in the absence of an injunction, it will be harmed in two ways.

First, plaintiff alleges that some of HDM's customers have already informed it of their intention to discontinue using its services in anticipation of the implementation of Modification 30. Pl.'s Mot. For Partial Summ. J. at 27; Pl.'s Mot. for Prelim. Inj. at 4. Plaintiff has included four e-mails in the Administrative Record indicating that HDM customers and prospective customers have chosen not to engage HDM or to continue using its services. Pl.'s Mot. for Partial Summ. J., App. at 1895–1898b. However, defendant and defendant-intervenor have also presented evidence that clearinghouses such as HDM will continue to play a role in Medicare claims processing after the crossover consolidation is completed. See Decl. of Peter Moore ¶ 36. There is also evidence in the record demonstrating that HDM is currently working with CMS to transition to the new COBA system of claims processing. Decl. of Joan Fowler ¶ 2.

In light of this, the Court concludes that HDM made a relatively weak showing that aspects of its business would likely be harmed. However, HDM did not show that it would no longer play any role in Medicare claims processing if crossover consolidation were implemented. Indeed, according to Peter Moore, Vice President of Government Services for GHI, "the new HIPAA requirements create a need for new services that a clearinghouse could fill." Decl. of Peter Moore ¶ 36. Specifically, according to Mr. Moore, because it is very expensive and technically challenging to comply with HIPAA, other clearinghouses that are in parallel production under COBA help smaller insurers who do not have the resources, or who do not want to acquire the resources, to achieve HIPAA compliance. *Id.*

Second, plaintiff alleges that absent an injunction, it will have lost its opportunity to compete on a level playing field with other bidders for the COB contract. Pl.'s Mot. for Partial Summ. J. at 27; Pl.'s Mot. for Prelim. Inj. at 4. More specifically, plaintiff alleges

that it was harmed because it was misled and discouraged from bidding on the original COB contract by the "Questions Received after COB Pre–Solicitation Conference" distributed by CMS. Tr. at 28, 95–98.

The Court finds that plaintiff's allegations that it was "misled" to forego its opportunity to bid on the entire COB contract ring hollow. At oral argument, the Court asked plaintiff how defendant's assertions that it intended to rebid the COB contract in 2006 affected plaintiff's request for injunctive relief. Plaintiff's counsel replied:

> I believe the answer to that question, your Honor, is that if all of the existing crossover infrastructure that's currently going on—the "old system" is still in place other than for four entities out of hundreds, if that were to go away before October 31st of next year, we would be irreparably harmed even though they're rebidding it.

Tr. at 113. If plaintiff were in fact capable of performing the entire COB contract, as it asserted, the possibility that the legacy systems might no longer be in place at the time the COB contract was rebid would be irrelevant.[16] Plaintiff's response suggests that its interest lies more in preserving its role in the "old system" than in achieving an opportunity to bid on the COB contract.

Defendant has demonstrated that an injunction could result in significant financial expenditures by the Government. The Government would have difficulty complying with the statutory deadlines established for HIPAA-compliant data exchange if the crossover consolidation were not permitted to go forward. Supp. Decl. of Harry Gamble ¶¶ 4–5. The 51 FIs and carriers have not independently been testing to achieve HIPAA compliant data exchanges with all trading partners. *Id.* If the crossover consolidation were enjoined, CMS would potentially be required to fund each of the FIs and carriers to test data exchanges with hundreds of trad-

---

16. This issue is separate from the question of whether plaintiff has standing to bring a claim as an "interested party" under CICA. For the purposes of CICA, a party's standing depends on its interest only in the proposed solicitation for the new work. *Northrop Grumman,* 50 Fed.Cl. at

456. For the purpose of this litigation, the relevant "new" work would be the crossover consolidation. In an earlier decision, the Court found that HDM had standing to protest Modification 30 as an interested party. *HDM v. United States,* 04–694, slip op. at 5–6 (Fed. Cl. June 10, 2005).

ing partners to ensure that these exchanges were HIPAA complaint. *Id.* ¶ 5.

Enjoining the crossover consolidation would also make it extremely difficult for defendant to comply with the Medicare Prescription Drug, Improvement, and Modernization Act of 2003. The Medicare Prescription Drug, Improvement, and Modernization Act, provides, *inter alia,* for a voluntary program for prescription drug coverage under the Medicare Program. See Pub.L. No. 108–173, 117 Stat.2066 (Dec. 8, 2003). This prescription drug reimbursement coverage, known as "Medicare Part D," is scheduled to become effective on January 1, 2006. Decl. of Joan Fowler, ¶ 7 fn. 2. GHI has adapted its coordination of benefits processes to collect eligibility data needed to meet the January 1, 2006 deadline for implementation of the prescription drug benefit. Decl. of Joan Fowler, ¶ 7 ("[T]he COBAs have been modified to include a requirement for partners to supply CMS with drug coverage information. The COB contract has thus taken on a new significance with the advent of Medicare 'Part D' ...."); Decl. of Peter Moore ¶ 24. There is no alternative means in place to collect this eligibility information. Decl. of Peter Moore ¶ 24. Any change in the processes that would require supplemental insurers to sign new or different COBAs would jeopardize the collection of information necessary to implement the Part D program in a timely fashion. Therefore, if the crossover consolidation were enjoined, it would likely render CMS unable to meet the January 1, 2006 deadline for providing prescription drug coverage for eligible Medicare beneficiaries. *Id.*

Defendant-intervenor argues that if an injunction were granted, GHI will risk losing key human resources that it retained to work on the consolidation, and will have wasted its investment in key equipment and resources. Decl. of Peter Moore ¶ 29–30. The beneficia-

ry of a CICA violation suffers no harm when the violation is corrected. *Cardinal Maint.,* 63 Fed.Cl. at 111. The Court has determined that defendant-intervenor was not, in fact, the beneficiary of a CICA violation. However, even if it were, considering only the prospective harms to plaintiff and defendant, the Court finds that the balance of harms weighs in favor of defendant.[17]

**B. The Public Interest**

The Court finds that the public interest overwhelmingly supports permitting the crossover consolidation to go forward. Plaintiff points to the public interest in ensuring fair and open competition in government contracts. Pl.'s Mot. For Summ. J. at 27. The Court recognizes that there is an overriding public interest in preserving the integrity of the federal procurement process by requiring government officials to follow procurement statutes and regulations. *See CW Gov't Travel,* 61 Fed.Cl. at 576. As previously discussed, the Court finds that the Government acted in accordance with CICA. However, even if Modification 30 to the COB contract were a CICA violation, the public interest would nevertheless weigh against granting an injunction.

If an injunction were issued, there would potentially be adverse consequences for the approximately 42 million beneficiaries of Medicare. Decl. of Joan Fowler ¶ 1. Much of the infrastructure formerly used to convey claims-paid information has been replaced as the COBA phase has been implemented. *Id.* ¶ 6. Accordingly, an injunction could prevent the effective communication of Medicare claims-paid information to supplemental insurers. *Id.* This would lead to health care providers not being informed of such payments, and ultimately, to unnecessary and confusing billing of Medicare beneficiaries

---

**17.** In their cross-motions for summary judgment, defendant and defendant-intervenor argued that plaintiff would not be irreparably harmed because it could recover just compensation pursuant to its taking claim. *See* Def.'s Cross–Motion for Summ. J. at 36; Def–Intervenor's Cross–Motion for Summ. J. at 39–40. The Court finds this argument to be unconvincing and has not taken it into account in weighing the balance of

harms. The argument is inconsistent with defendant's position that plaintiff's taking claim is without merit. *See* Tr. at 124–25. Furthermore, it is not clear that the just compensation sought by plaintiff would redress the irreparable harm of being denied the opportunity to bid on the work plaintiff contends should have been competed.

for services for which Medicare has already paid. *Id.*

In addition, as discussed *supra* at Section IV.A., full implementation of the COBA transition will facilitate compliance with HIPAA. The objective of HIPAA, *inter alia,* is to protect the privacy of patients' medical information. *See generally* P.L. 104–191, 110 Stat.1936 (1996), (codified as amended in scattered sections of 18, 26, 29 and 42 U.S.C.). Therefore, Medicare beneficiaries have an interest in the crossover consolidation going forward to ensure the privacy of their medical information. Similarly, as discussed *supra* at Section IV.A., any change in the process that would require supplemental insurers to sign new or different COBA agreements would make the timely implementation of Medicare Part D very difficult. This would clearly result in a serious detriment to Medicare beneficiaries who wished to participate in Part D prescription drug coverage.

In addition, stopping the crossover consolidation at this point would perpetuate burdens and inefficiencies of the old system. Supplemental payers would be forced to continue receiving Medicare claims paid data from multiple FIs and carriers in multiple formats. Decl. of Peter Moore ¶¶ 7, 26. Where supplemental insurers do not have Trading Partner Agreements in place with regional FIs and carriers, claims will need to be processed in hard copy, resulting in increased expense and slower payments to health care providers. *Id.* ¶ 26. In addition, beneficiaries will continue to shoulder the burden of submitting paper claims in this situation. *Id.*

Finally, the investment that the supplemental insurers have made in testing and implementing the new process also weighs against granting plaintiff's request for injunctive relief. As previously discussed, four trading partners are currently in live production and have cancelled their local agreements and terminated their legacy systems and an additional 125 are in beta or parallel testing. Decl. of Joan Fowler ¶ 4; Tr. at 87–88. Fiscal intermediaries and carriers have been advised to plan for the elimination or scaling back of most of their staff who supported the former crossover process. Tr. at 90. Furthermore, many insurers who have signed COBAs have allowed their Trading Partner Agreements with FIs and carriers to lapse. Decl. of Peter Moore ¶ 27. Supplemental insurers, FIs and carriers that have acted in reliance on the crossover consolidation would be unfairly harmed if the process were to be enjoined at this late juncture. Accordingly, even if one were to conclude that Modification 30 effected a cardinal change (which the Court has concluded it did not) plaintiff's request for injunctive relief would have to be denied.

## CONCLUSION

For the reasons set forth above, plaintiff's Motion for Partial Summary Judgment on the Administrative Record is DENIED, and defendant's Cross–Motion for Partial Judgment Upon the Administrative Record and defendant-intervenor's Cross–Motion for Partial Summary Judgment on Counts II and III (treated as a motion for judgment on the administrative record pursuant to RCFC 56.1 with respect to plaintiff's second and third claims for relief) are GRANTED.

Plaintiff's Motion for Preliminary Injunction is DENIED as moot.

IT IS SO ORDERED.